UNITED STATES DISTRICT COURT

DISTRICT OF UTAH- CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JERMAINE DION WHITE,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 2:15-CR-00020-RJS-BCW<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Brooke C. Wells |

The United States indicted the Defendant, Jermaine White, on several drug and firearm charges stemming from events occurring in the dark early morning of November 7, 2014.[1]  Now before the court is White's Motion to Suppress,[2] in which he argues that a gun, drugs, and drug paraphernalia obtained as a result of initially-warrantless searches of an apartment in which he had been hiding before his arrest were obtained in violation of the Fourth Amendment protections against unreasonable searches and seizure.[3]

Having carefully considered the parties' briefing, testimony offered at an evidentiary hearing, and the argument of counsel, the court concludes that no Fourth Amendment violation occurred during the apartment searches, and the evidence derived from them need not be suppressed.  White's Motion is DENIED.

---

[1] The charges against White include being a felon in possession of a firearm and ammunition; possession of a firearm in furtherance of a drug trafficking offense; distribution of cocaine, methamphetamine, and marijuana; and possession of marijuana, cocaine, and methamphetamine with intent to distribute.  (Dkt. 1, Unsealed Indictment.)

[2] Dkt. 40.

[3] These were the items White identified in his briefing.  At the final argument hearing on his Motion, his counsel further stated that White sought to exclude statements made by others who had been in the apartment searched at the time he was arrested, and any odor of marijuana that officers may have smelled.

## BACKGROUND

Sometime before November 7, 2014, a confidential source informed Unified Police Department Detective Denise Lovendahl[4] that an individual known as "J-ROC" was selling crack cocaine and that he was known always to have a gun in his possession.[5]  Upon receiving this information, Detective Lovendahl reviewed J-ROC's file kept by the Metro Gang Unit.[6]  She learned that J-ROC was a gang moniker for an individual named Jermaine White,[7] and confirmed that he was known "to have a gun on him at all times."[8]  Upon further investigation, Detective Lovendahl learned that White had a history of drug distribution, violent crimes, and gang membership.[9]  She also found that he was the subject of an outstanding arrest warrant.[10]  Later, a confidential source telephoned Detective Lovendahl to inform her that they had seen White in a Chevy Malibu car located at a Salt Lake City area hotel called the Pavilion Inn, where officers believed White was staying.[11]  The source provided Detective Lovendahl with the rental car's Arizona license plate number.[12]

At about 12:40 a.m. on November 7, 2014, fellow Unified Police Department Detective Brett Miller found the car at the Pavilion Inn, and called Detective Lovendahl to inform her of his discovery.[13]  In response, Detective Lovendahl drove to the hotel parking lot in an unmarked Jeep SUV, where she used binoculars to watch White's car for ten to fifteen minutes.[14]  An

---

[4] At the time of the events in question, Detective Lovendahl's surname was Ikemiyashiro.  Transcript of Evidentiary Hearing on Motion to Suppress (Dkt. 53) at 18:15-24; Dkt. 50-3 (warrant).
[5] Tr. 19:4-14; 57:23-25; 57:1.
[6] Tr. 19-20.
[7] Tr. 19:15-25.
[8] Tr. 58:2-5.
[9] Tr. 20:4-13.
[10] Tr. 20:14-24.
[11] Tr. 21:9-15; 23:16-19; 41.
[12] Tr. 21:9-24.
[13] Tr. 23:15-22; 25:15-18; Dkt. 50-3 at 4 (Miller Affidavit attached to Search Warrant).
[14] Tr. 23-24; 27:23-25.  Detective Miller was also in an unmarked vehicle, a Ford truck.  Tr. 28:1-2.

Oldsmobile carrying two females parked a few spots away from White's car.[15]  White emerged from the hotel and got into his Chevy Malibu.[16]  A female left the Oldsmobile and entered the Malibu on its passenger side.  After a few minutes, she returned to the Oldsmobile.[17]  Both cars then left the parking lot and went separate ways.[18]

Detective Lovendahl determined that White's vehicle should be stopped so the outstanding arrest warrant could be executed.[19]  Because she and Detective Miller were driving unmarked vehicles, a West Valley City, Utah police officer driving a marked patrol car was enlisted to complete the stop.[20]  The West Valley City officer followed White's Malibu, and turned on his red and blue emergency lights and his siren.[21]

But White did not stop.  Instead, he fled, driving away from the West Valley City officer and four other law enforcement vehicles then trailing him.[22]  Law enforcement officers, including Detectives Lovendahl and Miller and West Valley City Officers Anthony Ricci and Sage Frederickson, communicated about the ensuing events to each other over a shared police radio.[23]

---

[15] Tr. 24:4-6.

[16] Tr. 24:9-22.

[17] Detective Lovendahl testified at the evidentiary hearing on White's Motion that she also observed White and the female inside his car "exchanging things." Tr. 25:2.  Although neither side chose to provide the court with a copy of Detective Lovendahl's report, Mr. White's counsel elicited from her that she did not include this fact in the relevant police report. Tr. 43.  But the court concludes that this fact is not inconsistent with Detective Lovendahl's other sworn testimony, which the court finds credible.  And, it is immaterial to the court's ruling.

[18] Tr. 25-26.  Unified Police Officer Scott Lloyd later stopped the Oldsmobile for a traffic violation after speaking to Detective Lovendahl.  Tr. 26-27.

[19] Tr. 28:10-13.

[20] Tr. 28:3-9.  The investigation of White was part of a multijurisdictional effort which included West Valley City law enforcement.  Tr. 28:14-18.

[21] Tr. 29.

[22] Tr. 29-30.

[23] Tr. 31-32; 66-68; 70; 105-106.  Detective Lovendahl lost sight of White when he drove into an apartment complex parking lot.  Tr. 31.

White drove into a multi-building apartment complex parking lot, and promptly crashed his car into a parked truck.[24]  Undeterred, he continued his flight on foot.  Officer Frederickson saw White running, pursued by West Valley City Officer Robert Brinton.[25]  Officer Brinton followed White to the north side of one of the complex's buildings.[26]  The building had stairways on both the north and south side.  Officer Brinton chased White up the north stairway, while Officer Frederickson ran up the stairs on the south.[27]  Meeting at the top floor—the fourth—the officers realized White had eluded them.[28]  Because neither saw White come down either stairway, they concluded that he had entered one of the four apartments on the fourth floor.  They called for assistance of other officers and secured the fourth floor.[29]

Officer Ricci ran to the fourth floor, where he was told that White was believed to be armed.[30]  Concerned for the safety of himself, his fellow officers, and those residing in the "high[ly] populated" apartment complex, Officer Ricci ran to his car to retrieve his ballistics shield.[31]  Upon returning, he found that officers had quickly eliminated two of the four apartments as possible hiding places for White—one had a paper stuck in the door that would

---

[24] Tr. 30-31.  Detective Lovendahl was advised of the crash by other officers via the police radio, and came upon the crash scene soon after it happened.  Tr. 32; 68.
[25] Tr. 107; 136.  According to an affidavit executed by Detective Miller at 2:00 a.m. on November 7, 2014, Office Brinton saw White discard packages as he fled on foot.  Dkt. 20-3 at 4.  Detective Miller retrieved the packages at some point and "discovered they contained distributable amounts of field tested positive amounts of cocaine base (crack) and methamphetamine."  *Id.*
[26] Tr. 108.
[27] Tr. 108.
[28] Tr. 109.
[29] Tr. 51; 109-110.
[30] Tr. 71.
[31] Tr. 71-72.

have fallen if someone had entered, while officers had searched and cleared another.[32] Thus, the police concluded that White was inside one of two remaining apartments—apartment 404 or the apartment across the hall from it.

Another officer instructed Officer Ricci to go to apartment 404.[33] Its door had a clearly visible, black shoeprint near the center, below and to the right of the knob.[34] Holding his shield, Officer Ricci "knocked" on the door with his foot, rang the doorbell, and loudly announced the presence of police.[35] He did this for about five minutes, but received no response.[36] While Officer Ricci was occupied with apartment 404, other officers attempted to contact any occupants of last remaining apartment, across the hall. They too received no response.[37]

Officer Ricci instructed other officers to check the doorknobs of the two apartments. The door to the apartment across from apartment 404 was checked, and was found to be locked.[38] But apartment 404's doorknob was unlocked, and an officer cracked it open a few inches.[39] Officer Ricci saw that the doorjamb had been damaged in a way that appeared consistent with a forced entry,[40] and Officer Frederickson also deduced that someone had "kicked in the door."[41]

---

[32] Tr. 75, 89. The apartment that was searched and cleared was apartment 401. The renter-occupant, Mr. Reyes, was awakened by police knocking, and when he opened the door, he saw several police officers with guns. They told Mr. Reyes they were looking for someone and they were coming in to look for him. Mr. Reyes did not object, and he stepped aside to allow the officers to come in to clear the apartment. Tr. 149-150. Officer Frederickson testified similarly that Mr. Reyes had answered the door, and the officers told him "we had someone flee. Can we just come in and check?" and that Mr. Reyes consented to the offices entering. Tr. 112:22-25; 113:1-2. Counsel for White argued that these accounts differ. (Dkt. 47 at 5.) The court concludes there is little difference between the accounts, and certainly no difference that undermines the credibility of Officer Frederickson's testimony.
[33] Tr. 73.
[34] Tr. 111; 114; Dkt. 50-3.
[35] Tr. 76.
[36] Tr. 76.
[37] Tr. 77.
[38] Tr. 78. From Officer Ricci's testimony, the court finds that the doorknob to the apartment across the hall from apartment 404 was checked before the knob to apartment 404. (Tr. 78; 93 (Officer Ricci agreeing to the proposition that the door to apartment 404 was opened after Officer Ricci had been focusing on apartment 404, and officers had "tr[ied] two other apartments."); 101-02 (Officer Ricci agreeing that officers had searched one apartment, then tried the door of "another apartment on [Ricci's command" and "then they opened 404 on [Ricci's] command."))
[39] Tr. 78; 92.
[40] Tr. 78; *see also* Dkt. 47-4 (photograph of doorjamb).

Officer Ricci feared that White "had fled, was possibly armed, had entered this apartment, and if it was occupied by residents, that they could be in harm's way."[42]  Holding his ballistics shield, he stood outside the apartment in the open doorway and loudly commanded anyone in the apartment to come out with their hands raised.[43]  Almost immediately, White appeared in the apartment's back hallway and walked toward Officer Ricci.[44]  Officer Ricci pointed his gun at White and ordered him to come out of the apartment.[45]  White exited, and officers took him into custody.[46]  Then, "[g]radually one by one," five other people followed White out of the apartment and the officers outside secured them.[47]  But the officers did not know if anyone was left in the apartment.[48]  They entered the apartment to conduct a check of the welfare of anyone who might remain.[49]

Once inside apartment 404, officers searched all the rooms and saw evidence of illegal drugs.  Shortly thereafter, officers obtained a warrant permitting them to search apartment 404.[50]  As a result of the search, they collected a firearm, illegal drugs, and other evidence, and charged White with multiple drug- and firearm-related offenses.

## DISCUSSION

White argues that law enforcement officers obtained evidence in violation of the Fourth Amendment when they cracked the door to apartment 404 and, after White was arrested and

---

[41] Tr. 116.
[42] Tr. 81.
[43] Tr. 81-82.
[44] Tr. 82-83
[45] Tr. 83.
[46] Tr. 84.
[47] Tr. 85:3-9.
[48] Tr. 98.
[49] Tr. 98.  Counsel for Mr. White notes that the last person out of the apartment told officers that no one else remained.  (Dkt. 47 at 9 (citing Tr. 141).)  Officer Ricci testified that though no one told the officers that there were more people inside, they were still uncertain if anyone remained, and went in to conduct a welfare check.
[50] Dkt. 50-3.

others exited and were secured, entered it to conduct a protective sweep without a warrant.  The court disagrees for the reasons set forth below.

## I.      Applicable Legal Principles

The Fourth Amendment guards against unreasonable searches and seizures by the government.[51]  It is hornbook Fourth Amendment law that "searches and seizures inside a home without a warrant are presumptively unreasonable."[52]  But "this presumption may be overcome in some circumstances because the ultimate touchstone of the Fourth Amendment is reasonableness."[53]  Thus, "the warrant requirement is subject to certain reasonable exceptions."[54]

One "clearly established exception to the warrant requirement" is "that emergency circumstances may in appropriate cases make a warrantless search constitutional if probable cause exists . . . ."[55]  Put another way, a "well-recognized exception applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'"[56]

The Supreme Court recognizes "several exigencies justify a warrantless search of a home."[57]  For instance, "officers may enter premises without a warrant when they are in hot

---

[51] U.S. Const. amend. IV.
[52] *Payton v. New York*, 445 U.S. 573, 586 (1980) (citations omitted) (holding warrantless felony arrests in the home are barred by the Fourth Amendment absent probable cause and exigent circumstances).
[53] *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citations omitted).

[54]  *Id.* (citations omitted).

[55] *United States v. Anderson,* 154 F.3d 1225, 1233 (10th Cir. 1998) (quoting *United States v. Aquino,* 836 F.2d 1268, 1270-71 (10th Cir. 1988) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984)).
[56] *King*, 563 U.S. at 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (other citations omitted)).  In *King,* the Supreme Court considered whether the exigent circumstances rule "applies when the police, by knocking on the door of a residence and announcing their presence, cause the occupants to attempt to destroy evidence."  563 U.S. at 455.  The Court reversed the Kentucky Supreme Court's determination that "the exigent circumstances rule does not apply . . . where the police should have foreseen that their conduct would prompt the occupants to attempt to destroy evidence."  *Id.*  Rather, where the police officers acted lawfully and in accordance with the Fourth Amendment before entering the residence to prevent the destruction of evidence, "the exigent circumstances rule applies."  *Id.*
[57] *King,* 563 U.S. at 460.

pursuit of a fleeing suspect."[58]   Further, under the emergency aid/public safety exception,

"officers may enter a home without a warrant to render emergency assistance to an injured

occupant or to protect an occupant from imminent injury."[59]   The government bears the burden to

show "exigent circumstances that overcome the presumption of unreasonableness that attaches to

all warrantless home entries."[60]   In determining whether this burden has been met, "an important

factor to be considered . . . is the gravity of the underlying offense for which the arrest is being

made."[61]   "When the government's interest is only to arrest for a minor offense, [the]

presumption of unreasonableness is difficult to rebut, and the government usually should be

allowed to make such arrests only with a warrant issued upon probable cause by a neutral and

detached magistrate."[62]

Another category of search exempted from the warrant requirement is the "protective

sweep."   A protective sweep "is a quick and limited search of premises, incident to an arrest and

conducted to protect the safety of police officers or others."[63]

---

[58] *Id.* (citing *United States v. Santana,* 427 U.S. 38, 42–43 (1976)).   In *Santana,* the Court held that police had probable cause to effect a warrantless arrest of the defendant, who was in a public space, for possession of heroin with an intent to distribute; and that her quick retreat into a private residence could not "thwart an otherwise proper arrest."  427 U.S. at 41.  The Court concluded that the case involved "hot pursuit"—meaning "some sort of a chase." *Id.* at 42.  And once the defendant was arrested, police were entitled to search her incident to the arrest.

[59] *Santana*, 427 U.S. at 42-43.

[60] *Welsh*, 466 U.S. at 750 (citing *Payton*, 445 U.S. at 586).

[61] *Id.* at 752.

[62] *Id.* at 750.  In *Welsh*, the Supreme Court rejected Wisconsin's reliance on alleged exigent circumstances—hot pursuit and the need to preserve evidence and the need to guard public safety—to justify a warrantless home arrest of the defendant on "a noncriminal, traffic offense"—driving while intoxicated.  466 U.S. at 753.  The Court rejected the hot pursuit justification because "there was no immediate or continuous pursuit of the petitioner from the scene of a crime." *Id.* at 753.  Rather, the defendant had driven his car into a field, stopped, gotten out and walked to his nearby home and went to bed.  The police were called about the defendant's erratic driving, arrived at the open field, interviewed a witness, and learned that the stopped car was registered to the defendant.  The police then went to the defendant's home, gained entry, and arrested the defendant—who had been sleeping in his bed naked. *Id.* at 743.  The Court further found that there was no ongoing threat to public safety where the defendant had abandoned his car.  Finally, the Court rejected the government's argument that exigent circumstances existed because the evidence of the defendant's blood alcohol level would be lost.  The Court noted that Wisconsin had chosen to make the charged conduct a "noncriminal, civil forfeiture offense for which no imprisonment is possible[]" and that this could not justify a warrantless intrusion into the defendant's home. *Id.* at 754.

[63] *Maryland v. Buie*, 484 U.S. 325, 327 (1990).

8

## II.     Analysis

White contends that officers: 1) were not permitted to open the door to the apartment to arrest White based simply on an outstanding arrest warrant; 2) lacked probable cause specifically to search apartment 404 because they were merely speculating as to White's whereabouts; and 3) no exigent circumstances existed to excuse them from seeking a search warrant.  In response, the United States concedes it does not justify its search of apartment 404 based only on the valid outstanding arrest warrant.  But, it contends that it had probable cause to search apartment 404 based on evolving circumstances and evidence in addition to the arrest warrant: 1) the information law enforcement officers had concerning White's criminal background; 2) the officers' own observations as they pursued White in the moments before the apartment search; and 3) the officers' investigative work in eliminating three other apartments as possible hiding places.  The United States further contends that the officers were not required to halt their efforts to get a warrant under the exigencies of the situation—hot pursuit of a criminal suspect and an emergency need to protect themselves and others from immediate harm.  Finally, the United States argues that after White was arrested just outside of apartment 404, officers were entitled to enter the apartment to conduct a protective sweep of the premises to ensure there were no additional dangers.

As discussed below, the court concludes that the United States has met its burden to show that the officers had probable cause to believe White was inside apartment 404 when they cracked open its door, and they were not required to first obtain a search warrant under the exigent circumstances presented.  And once White was arrested just outside of apartment 404, the officers were entitled to enter the apartment to conduct a protective sweep.

### A.  White's Standing to Challenge the Officers' Searches

Preliminarily, the court notes that the parties have stipulated to White's standing to challenge the search of apartment 404.  A defendant has standing to challenge a search when "he or she has a reasonable expectation of privacy in the area being searched."[64]  White's counsel proffered during argument that apartment 404's renter had given White permission to be inside it.

Aside from this, there are no stipulations to other facts that might otherwise have related to standing.  And, there is no dispute that law enforcement officers were unaware that White had permission to be inside apartment 404 or knew its occupants.  Rather, officers believed White was staying at the Pavilion Inn.  White led them on a car chase to the apartment complex parking lot before crashing his car into a parked truck and continuing to flee on foot into an apartment building.

### B.  Exigent Circumstances

The United States argues that the exigencies of hot pursuit of a fleeing suspect and an emergency need to ensure safety for themselves and the public warranted their search of apartment 404.  As discussed below, the court agrees.

#### 1.  Hot Pursuit

Law enforcement officers are justified in entering a residence without a warrant when they "have probable cause to effect an arrest and face exigent circumstances," including "an ongoing hot pursuit of a fleeing suspect."[65]  Here, there is no dispute that on November 7, 2014, law enforcement officers were justified in initiating a traffic stop to arrest White based on a

---

[64] *United States v. Shareef*, 100 F.3d 1491, 1499 (10th Cir. 1996) (citations omitted).

[65] *United States v. Martin*, 613 F.3d 1295, 1299 (10th Cir. 2010).

valid, outstanding arrest warrant.[66]  They had further cause to apprehend White based on his

flight from law enforcement officers who tried to arrest him, including an officer driving a

marked vehicle with active lights and sirens and White's flight on foot from a car accident that he

had just caused.  But, the parties dispute whether officers had probable cause to believe that

White was inside apartment 404 before they opened its door, and whether officers were truly

engaged in hot pursuit.

The court first considers whether the officers had probable cause to believe White was

inside apartment 404 when they cracked open its door without first having obtained a search

warrant.[67]  The Tenth Circuit has explained that "probable cause justifying a search is 'a fluid

concept—turning on the assessment of probabilities in particular factual contexts—not readily, or

even usefully, reduced to a neat set of legal rules.'"[68]  Analysis of probable cause "requires

application of a 'practical and common-sensical standard,' based on the 'totality of the

circumstances.'"[69]  Warrants, for example, are based on probable cause "if the magistrate makes

a 'practical, common-sense decision' that, 'given all the circumstances set forth in the affidavit . .

. . there is a fair probability that contraband or evidence of a crime will be found in a particular

place.'"[70]  The Tenth Circuit explains that "[f]or probable cause to exist, an officer need only

have the specific factual knowledge that justifies a search or arrest, regardless of the officer's

---

[66] White notes that Detective Lovendahl was unaware, however, whether the arrest warrant was one for a felony or a misdemeanor before the search in question occurred.

[67] *See United States v. Steagald*, 451 U.S. 204, 212-13 (1981) (noting that while "arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ," and that search warrant may issue only upon "showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.").

[68] *United States v. Edwards*, 813 F.3d 953, 960 (10th Cir. 2015) (quoting *Florida v. Harris,* 133 S.Ct. 1050, 1056, 185 L.Ed.2d 61 (2013)).

[69] *Id.* (quoting *Harris*, 133 S.Ct. at 1055).

[70] *Id.*

actual motivation."[71]  In light of the totality of the circumstances this case presents, the court concludes that the law enforcement officers had probable cause based on specific facts to believe White would be found inside apartment 404 when they opened its door.

Law enforcement officers testified concerning the basis for their belief that White was on the fourth floor of the building into which they had chased him, where officers had run up stairways on both sides of the building until they reached the top floor, the fourth.  When they did not see him outside of any apartment on that floor, they reasonably believed he had taken refuge inside one of the four apartments.  They secured the fourth floor and began conducting a quick process of eliminating apartments as possible hiding places.  They eliminated one apartment after searching it, one after seeing a paper wedged in the doorway, and one that was locked and did not have a dark footprint on the door like that on the door of apartment 404.  At the moment in time they opened the unlocked door to apartment 404, it was "the most likely choice."[72]  The court concludes that the officers had probable cause to believe White was inside of apartment 404.[73]

---

[71] *United States v. Huff*, 782 F.3d 1221, 1226 (10th Cir. 2015) (citations omitted).

[72] *United States v. Scott*, 520 F.2d 697, 700 (9th Cir. 1975), *cert. denied*, 423 U.S. 1056 (1976) (officers had probable cause to search last of seven apartments in which they had surmised bank robbery suspects might be hiding; "[t]here was reasonable cause to believe that the fugitives had entered the apartment complex" and officers knew by that time "they were not in 6 of the 7 units most likely to be their objectives.").

[73] The court agrees with the United States' characterization its briefing that the officers had "honed in" on apartment 404 when they searched it.  (Dkt. 50 at 10.)  They had searched one apartment, saw paper in the doorway of another, and had checked the lock on the door of the apartment across the hall before they checked apartment 404's doorknob, found it unlocked, and opened its door—which bore a dark footprint.  Under these facts, they had probable cause to search apartment 404 for White, even if the apartment across the hall could possibly have offered another hiding place.  In fact, the court notes that the officers may have had probable cause to search the apartment across the hall as well under the facts of this case, where White had just been chased to a specific floor, and police had quickly narrowed the search to two apartments before checking the doors.  *United States v. Rios*, 611 F.2d 1335 (10th Cir. 1979) (citations omitted) (noting, in warrant context, that if probable cause is shown, officers may search several different places or residences; however probable cause must be shown for searching each area.").

The court finds support for this conclusion in the Tenth Circuit case of *United States v. Dodds*, in which the court affirmed the district court's denial of a motion to suppress.[74]  In *Dodds,* a police officer in a car followed a bank and convenience store robbery suspect in possession of a grenade to the vicinity of an eight-unit apartment building.  The suspect had allegedly just tried to rob a convenience store.  The officer lost sight of the suspect, so he stopped on the side of the building "where he thought the suspect would pass if he had not gone into one of the apartments in the building."[75]  The officer saw that one of the apartments on the lower level was boarded up but that the door was ajar.  While waiting for backup to arrive, "the door to the apparently vacated apartment was pushed open and [the defendant] was found sitting on the floor . . . with a grenade by his side."[76]  The district court denied the defendant's subsequent motion to suppress, concluding both that the defendant was a trespasser and lacked standing to object to the apartment search and that in any event, the circumstances demonstrated "a true case of hot pursuit and exigent circumstances that would warrant an arrest without a warrant . . . ."[77]

The Tenth Circuit affirmed on both grounds.  With regard to probable cause and hot pursuit, the court noted that "the trial court's finding of probable cause is fully supported by the record, where "[t]he situation was fraught with exigency, not only with respect to the hot pursuit of the suspect and the apprehended presence of a lethal grenade, but the necessity of promptly ascertaining whether assuredly the suspect with his weapon was within the apartment or had fled elsewhere to require prompt search of other apartments."[78]

---

[74] 946 F.2d 726 (10th Cir. 1991); *cert. denied* 516 U.S. 1153 (1996).

[75] *Id.* at 727.

[76] *See id.*

[77] *See id.* at 727-28.

[78] *Id.* at 729.

In arguing that the officers lacked probable cause to search apartment 404, White relies primarily on a case from the District of Columbia Court of Appeals, *In re K.H.*[79]  There, a woman had been robbed on the street in Washington, D.C.  Four days later, D.C. police officers responding to another attempted robbery chased the suspect into a nearby four-unit apartment building, then lost sight of him.  Somehow, officers found the suspect in apartment three and detained him.  The first robbery victim identified him as the perpetrator, and he was arrested.[80]  Later, the defendant moved to suppress the fruits of the warrantless apartment search.  Officers in response argued that exigent circumstances justified the search.[81]  The trial court denied the defendant' motion.  On appeal, the court focused its analysis on the issue of the officers' burden to show probable cause to "believe the robber had entered that apartment minutes earlier."[82]  But it concluded the officers failed to meet that burden simply because the lone officer who testified about the facts leading up to the search was "too unreliable and uncertain to support such a finding."[83]  That officer testified had not been on the scene, and, more importantly, had only vague information received from others that they heard someone in apartment three talking about police being outside and "something about running."[84]  With no further evidence concerning how police officers determined to search apartment three, the appeals court reversed the denial of the motion to suppress.  In reaching this conclusion, the *K.H.* court specifically noted that the record lacked evidence showing that officers "zeroed in on apartment three by a process of elimination, after excluding other apartments in the building as possible hiding places."[85]

---

[79] 14 A.3d 1087, 1088 (D.C. Ct. App. 2011).
[80] *Id.*
[81] *Id.* at 1089.
[82] *Id.* at 1091.
[83] *Id.*
[84] *Id.* at 1092.
[85] *Id.*

But unlike the officers in *K.H.*, officers in the case at bar testified that they did precisely what the D.C. court found was lacking.  They exercised investigative techniques to exclude other apartments as places where White might be hiding, and finally zeroed in on apartment 404 and the apartment across from it.  Finding the door to apartment 404 unlocked, and bearing a black footprint below the doorknob, they "honed in on [it] after a process of elimination,"[86] and cracked the door open.  The court concludes the officers had probable cause to believe White was inside apartment 404.

The court next turns to the issue of whether officers were excused from seeking a warrant before opening the door because, as the United States argues, they were facing the exigent circumstance of hot pursuit of a fleeing suspect.  The court concludes that they were excused under the circumstances from first obtaining a warrant.

Hot pursuit of a suspect entails "some sort of a chase, but it need not be an extended hue and cry in and about (the) public streets."[87]  It "occurs when an officer is in 'immediate or continuous pursuit' of a suspect from the scene of a crime."[88]  But the Tenth Circuit suggests when the initially-suspected crime is minor, "additional circumstances" are likely needed to justify an entry into a person's home.[89]

For instance, in the seminal case of *United States v. Santana*, the Supreme Court held that a warrantless entry into a home to effectuate an arrest was justified on hot pursuit grounds, where police officers had probable cause to arrest the suspect in public following a controlled drug

---

[86] Dkt. 50 at 10.
[87] *U.S. v. Jackson*, 2005 WL 1566764, at *2 (July 6, 2005) (quoting *Santana,* 427 U.S. at 42–43 (internal quotation marks omitted)).
[88] *Id.* (quoting *Welsh v. Wisconsin,* 466 U.S. 740, 753 (1984) (other citations omitted)).
[89] *Mascorro v. Billings,* 656 F.3d 1198, 1209 (10th Cir. 2011) (noting "[w]hile hot pursuit of a felon might be sufficient, neither the Supreme Court nor this Court has ever found an entry into a person's home permissible based merely on the pursuit of a misdemeanant; additional circumstances have always dictated the result.").

transaction and she immediately retreated into her home.[90]  The Court emphasized the officers'

concern that in addition to simply eluding arrest, evidence might be destroyed.  The Court

concluded that "a suspect may not defeat an arrest which has been set in motion in a public place

. . . by the expedient of escaping to a private place."[91]

In *Bledsoe v. Garcia*,[92] the Tenth Circuit found that exigent circumstances justified law

enforcement officers' warrantless entry into a family home to arrest a man on a misdemeanor

bench warrant for being absent without leave from his post in the U.S. Navy, because the nature

of the crime was serious and his family's response to law enforcement's attempt to arrest him

was concerning to officers.[93]

Officers in that case had gone to the home of Larry Bledsoe's parents to arrest him.  Larry

initially came to the door, and admitted to an officer that he was A.W.O.L. from his post.[94]  The

officer then allowed Larry to re-enter the home to tell his mother he was being arrested.[95]  After

he did, however, a series of unusual events ensued.  Someone yelled from inside the home that

Larry was "not going anywhere with that son-of-a-bitch," other persons inside also began

yelling, and a woman stood at the door in an attempt to keep officers from entering.  After she

was arrested, officers entered the home and were confronted with "loud talk and profanity" and

another woman who tried to block them from a hallway.  She too was arrested.[96]  By then, Larry

---

[90] 427 U.S. at 41 (citations omitted).
[91] *Id.* at 43.
[92] 742 F.2d 1237 (10th Cir. 1984).
[93] Although the specific term "hot pursuit" is not used in this decision, the Tenth Circuit has subsequently cited *Bledsoe* in evaluating hot pursuit.  *See Mascorro*, 656  F.3d at 1207.
[94] *See id.* at 1238.
[95] *See id.*
[96] *Id.* at 1239.

had escaped.[97]  The women who had been arrested filed an unsuccessful civil rights suit against the officers.

On appeal, the plaintiffs argued that the district court erroneously instructed the jury that the officers were entitled to enter the home without a search warrant.[98]  The Tenth Circuit concluded that there was no reversible error in giving that instruction because the "undisputed evidence" established that "there were exigent circumstances justifying the entry of the house where [the suspect] had been staying . . . ."[99]  The court focused on the serious nature of the offense charged (though a misdemeanor) and the "disturbing" reaction to the officers' attempt to effectuate arrest in concluding that "the resistance and the possibility of flight justified the immediate actions taken to apprehend [Larry] Bledsoe . . . ."[100]

But, in a civil action brought against law enforcement officers pursuant to 42 U.S.C. § 1983, the Tenth Circuit affirmed a district court's determination that hot pursuit did not justify officers' warrantless entry into a family home to apprehend a seventeen year old who fled when an officer attempted to pull over his car, which lacked taillights.[101]  After failing to pull over, the young man drove two blocks to his parents' home, ran inside the lone door, and hid in a bathroom.  The officer followed him to his home, yelled at his mother, drew his firearm, pepper sprayed three family members, entered the home, and kicked down the bathroom door to apprehend the young man.[102]

The Tenth Circuit concluded that these circumstances did not "indicate the sort of 'real immediate and serious consequences' of postponing action to obtain a warrant" and therefore

---

[97] *See id.*
[98] *See id.* at 1240.
[99] *Id.* at 1241 (citations omitted).
[100] *Id.* (citing *Steagald v. United States,* 451 U.S. 204, 205-06 (1981) (other citations omitted)).
[101] *See Mascorro*, 656 F.3d 1198.
[102] *See id.* at 1202.

declined to find that situation "the kind of exigency excusing an officer from obtaining a warrant before entering a home."[103]  The court specifically noted the minor nature of the traffic offense committed by a seventeen year old "with whom the officer was well acquainted," the "low or nonexistent" risk of flight from a home with just one door, the lack of any danger that evidence might be destroyed, and "no officer or public safety concerns."[104]   On these facts, the trial court had correctly rejected the officers' argument that they were entitled to qualified immunity for the search and denied their motion for summary judgment.  Rather, as the Tenth Circuit held, the officers' actions violated the plaintiffs' Fourth Amendment rights that were clearly established at the time of the search.[105]

Under the guidance these cases offer, the court concludes that law enforcement officers were engaged in hot pursuit of White when they opened the door to apartment 404, and were thus excused from first seeking a search warrant.  As in *Bledsoe*, officers had reason to be concerned about the serious nature of White's offenses, the alarming nature of his reaction to their attempt to arrest him, and the very real possibility that he would continue his efforts to flee.

First, officers were engaged in an immediate and continuous chase of a criminal suspect, and they had good reason to consider his offenses to be serious.  White was wanted on an outstanding felony warrant.  Although the record does not establish that all law enforcement officers were aware of whether the warrant was for a felony or a misdemeanor, the court does not find it dispositive here in light of other highly concerning circumstances.  In addition to the outstanding arrest warrant, law enforcement officers were aware of White's history of drug distribution, violent crimes, habit of always carrying a firearm, and gang membership.

---

[103] *Id.* at 1207 (citations omitted).
[104] *Id.*
[105] *See id.* at 1204-10.

Second, White's determined resistance displayed in reaction to the officers' attempts to pull him over was highly concerning. White fled from officers both in a car and, even upon crashing into a truck, continued his flight on foot and into a residential apartment complex in the dark of the early morning hours. Officers had reason to believe he was both armed with a gun and that he had entered an apartment on the fourth floor of one of the complex's buildings—a place officers were unaware he would be welcome. As discussed more fully below in the court's analysis of the emergency aid/public safety exigency, these circumstances are in stark contrast to those in *Mascorro*, where the court found no hot pursuit in part because there were no "officer or public safety concerns." Rather, as the court did in *Dodds*, this court finds that hot pursuit justifies the officers' very limited, warrantless search of an apartment to locate and apprehend a fleeing, armed, and hiding suspect.[106]

Finally, these facts clearly raised the specter that White would continue to flee, and possibly escape arrest if he was not quickly apprehended without awaiting a search warrant. This stands in contrast to cases where hot pursuit is not found because a suspect, wanted on a minor infraction, has taken refuge at his own home and there is little danger of flight or the destruction of evidence.[107]

The court therefore concludes that officers had probable cause to believe that White was hiding in apartment 404, and that police were engaged in "immediate or continuous" hot pursuit of the sort which excuses the general warrant requirement.

## 2.   Emergency Aid/Public Safety

But even if the court did not conclude that hot pursuit justified officers in opening apartment 404's door without a warrant, it would conclude that the so-called emergency

---

[106] 946 F.2d 726.
[107] *See, e.g., Mascorro*, 656 F.3d 1198; and *Welsh*, 466 U.S. 740.

aid/public safety exigent circumstance exception to the warrant requirement applies with force in this case.  The Tenth Circuit applies this exigent circumstances exception to the warrant requirement "when the circumstances posed a significant risk to the safety of a police officer or a third party."[108]  The test to determine this exception's application is "two-fold, whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable . . . ."[109]  The court "evaluate[s] whether a reasonable belief existed based on the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers."[110]  An officer's subjective motives for the search are irrelevant.[111]  The reasonable belief standard "does not require absolute certainty," and it "is more lenient than the probable cause standard."[112]

For example, in *U.S. v. Walker*, the Tenth Circuit affirmed the district court's conclusion that police officers were justified in entering a home under exigent circumstances in order to protect their own safety.[113]  There, the police went to a home to investigate a 911 call in which it was reported that two men in the home had guns and were threatening each other.  One officer approached the door as two other officers arrived at the scene.  The officer at the door knocked several times on a storm door, and announced his presence.  Getting no response, he opened the storm door to knock on an inner door, which was nearly a foot ajar.  His knocking "caused the door to open further, but he saw no one inside and nothing indicating that a physical struggle had

---

[108] *U.S. v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006) (citations omitted); *see also McInerney v. King*, 791 F.3d 1224, 1231-32 (10th Cir. 2015) (citations omitted).
[109] *Najar*, 451 F.3d at 717.
[110] *McInerney*, 791 F.3d at 1232 (quoting *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008) (citations omitted).
[111] *See id.* (citations omitted).
[112] *Id.* (citations omitted).
[113] 474 F.3d 1249 (10th Cir. 2007).

taken place."[114]  He again announced his presence, which elicited a shout from inside: "Yeah, and I got a goddamn gun."[115]  All three officers immediately entered the home and ordered the speaker to keep his hands in the air.[116]  The officers subdued the speaker, handcuffed him, and led him outside—but did not arrest him.  They then conducted a sweep of the bedrooms, bathrooms, and closets where someone might be hiding in light of the fact that dispatchers had been told that two men had been fighting inside.[117]  They found firearms in plain view in two bedrooms.  The man they had apprehended was arrested on charges of being a felon in possession of a firearm and ammunition.[118]

The Tenth Circuit first determined that the knock on the inner door, although open, was not a "Fourth Amendment intrusion" because it is a common act to open a storm door to knock on an inner door, and "such action does not violate an occupant's reasonable expectation of privacy."[119]  And, although the entry into the home was a Fourth Amendment intrusion, the court concluded that there was no constitutional violation because exigent circumstances—the threatening remark—"justified the officers in taking prompt action to protect themselves."[120] The court explained:

> Although retreat was an alternative, it was also reasonable for them to take control of the situation by entering to disarm Mr. Walker, who could otherwise continue to pose a danger to the officers and others.  Because the officers could reasonably believe that they needed to enter Mr. Walker's home to protect their own safety, and because they acted reasonably in entering and restraining Mr. Walker, we hold that the officers committed no Fourth Amendment violation in those actions.[121]

---

[114] *Id.* at 1251.
[115] *Id.*
[116] *Id.* at 1252.
[117] *See id.*
[118] *See id.*
[119] *Id.* at 1253.
[120] *Id.*
[121] *Id.*

In contrast, the Tenth Circuit in *Cortez v. McCauley* affirmed the district court's conclusion that law enforcement officers failed to show that they believed they faced "an emergency, i.e., an immediate need to protect their lives or others from serious injury or threatened injury" when they entered and searched a married couple's home in the middle of the night without a warrant and arrested the husband on suspicion of child molestation.[122]   The husband had been accused of molesting a child who the wife normally cared for as part of her babysitting business.  The child in question was nowhere near the accused at the time police officers appeared at his family home to arrest him, and there was likewise no evidence that the couple presented any danger to the officers.

In light of these authorities, the court concludes that law enforcement officers in this case were justified under the emergency aid doctrine in opening the door to apartment 404, examining the doorjamb, and calling out to any occupants inside.  First, the court finds that a "prudent and cautious"[123] officer would have had an "objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others."[124]   In the moments before officers opened the door to apartment 404, they had tried to arrest White, whom they understood was affiliated with a gang and always armed with a gun.  They knew he was wanted on an outstanding arrest warrant and had defiantly fled from police—both in a car and on then foot after crashing and abandoning his car.  At one o'clock in the morning, a determined White led officers on a chase into a heavily-populated residential apartment complex.  This is a time of night when many people are home, asleep, and not alert for their own well-being.  And it is important to note that law enforcement officers believed White was staying elsewhere, at the

---

[122] 478 F.3d 1108, 1123 (10th Cir. 2007).
[123] *McInerney*, 791 F.3d at 1232 (citations omitted).
[124] *Najar*, 451 F.3d at 717.

Pavilion Inn.  No evidence presented to the court suggests that officers believed White had permission from anyone residing in the complex to stay with them.  Thus, when officers chased White to the fourth floor of one of the complex building and lost sight of him, they could reasonably have believed on those facts that he forcibly entered an apartment that was not his own and which he did not have permission to enter.  This belief was corroborated by additional evidence—the dark footprint on apartment 404's door that was visible to officers.[125]  The court determines that law enforcement officers could reasonably have feared for their own safety and the safety of apartment complex residents.

White seeks to avoid this conclusion by identifying a number of things that did not happen on the morning in question to alert officers that White might be inside apartment 404—including that no 911 call was made and no screams, gunshots, or loud noises emanated from the apartment.  The court finds White's argument unpersuasive because it fails to account for the many above-discussed events that did take place.  It is certainly true that in other instances where the emergency aid exception applies, law enforcement first becomes aware of the exigency via a 911 call from a third party, or by hearing cries from a victim, or by seeing a suspect actually inflicting injury on another.  But in this case, the officers' knowledge of the exigency was based upon their own observations of White's actions and their knowledge of White's criminal history and habit of always carrying a gun.  The court will not require officers to wait until they receive a third party 911 call when they are already on the scene and aware of the danger.  Likewise, the

---

[125] In arguing that the emergency aid doctrine applies, the United States also argues that police officers noticed damage to apartment 404's doorjamb consistent with force entry, and that from this they inferred that White had force open the door and that the apartment's occupants might be in danger.  But, the court understands that the officers could not have seen the damage to the doorjamb until after they opened apartment 404's door—the search at issue in the court's evaluation of exigent circumstances.  (Dkt. 50 at 6 (noting that after the door opened a few inches, officers noticed damage to the doorjamb); Dkt. 47-4 (photograph of the damaged doorjamb).)  The court therefore does not consider the damage to the doorjamb in determining whether the officers were justified in opening the door in the first instance.

court cannot conclude under these facts that the officers were required to wait longer to further risk harm to themselves or those residing in the apartment complex as White seems to urge—until they hear screams and gunshots—in order to contain an immediate danger.  The Fourth Amendment simply "does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."[126]

Second, the court concludes that the manner and scope of the officers' search was reasonable.  The officers simply checked apartment 404's doorknob, cracked its door a few inches, and continued to call out to those inside before White appeared and exited the apartment.

Accordingly, the court concludes that the emergency aid/public safety exception to the warrant requirement applies and independently justified the officers' actions in opening the door to apartment 404 without first obtaining a search warrant.

### C.  Protective Sweep of Apartment 404

A "protective sweep" is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."[127]  Such searches are constitutionally permissible when an officer has "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrants the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others."[128]  And, the Tenth Circuit has recognized that even when an arrest occurs outside of a residence, "the exigencies of a situation may make it reasonable for officers to enter a home without a warrant in order to conduct a protective sweep."[129]

---

[126] *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 298-99 (1967).
[127] *Maryland v. Buie*, 484 U.S. 325, 327 (1990).
[128] *Id.* (citations omitted).
[129] *Unites States v. Cavely*, 318 F.3d 987, 995 (10th Cir. 2003) (citations omitted).

The court concludes that officers were entitled to conduct as they did a brief protective sweep of apartment 404 for their own safety and that of anyone who might remain inside.  When they conducted the sweep, the officers had just witnessed White and several others exit apartment 404 after hiding from them for several minutes following a tense chase.  They arrested White in a common area just outside the apartment he and others had exited.  They knew that White had a history of violence, connections to gangs, and a habit of always being armed.  He had just made extraordinary efforts to evade arrest.  And it appeared to officers, at least initially, that White may have forcibly entered apartment 404 to hide.  Were that so, officers may have reasonably feared that someone inside the apartment might have required immediate attention due to having been harmed and unable to leave, or was of a tender age.  Alternatively, if White had permission to be in the apartment, then it appears he was with people who were willing to harbor a fleeing suspect.  Under either scenario, the court concludes it was reasonable for the officers to conduct a brief protective sweep of the apartment.

White argues this conclusion is incorrect three reasons.  First, White notes that a protective sweep is permitted only incident to a lawful arrest.  He contends that the initial search of apartment 404—the opening of the door—was illegal and that his eventual arrest was also therefore unlawful.  But, as discussed above, the court has concluded that officers acted lawfully when they cracked open the door to apartment 404.

Second, White seems to argue that because his arrest occurred in a common area outside of the apartment, the protective sweep doctrine may not apply.  Here, White contends with scant analysis that the doctrine "applies only to the 'premises' where a person was arrested."[130]  Of course, the Tenth Circuit has explained that officers may enter a home to conduct a sweep when

---

[130] Dkt. 52 at 12.

that action is warranted under the circumstances.[131]  The court concludes under the facts discussed above, and particularly where White's arrest took place very near the entrance to apartment 404, it was reasonable for officers to do just that.

Finally, White argues that officers "had no need to search the apartment for their own or anyone else's safety" because after police opened the door, several people voluntarily exited along with White and the apartment's renter informed them no one else was inside.  Dkt. 52 at 13.  But under the facts of this case, the court will not require the officers to accept with certainty that because people voluntarily left the apartment—after police had been knocking for several minutes and finally had opened the door—everyone had necessarily exited; or to take at face value the assurances of the apartment's renter.  And this is particularly true where the arrests took place outside the renter's home—on "the adversary's 'turf'" where "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings."[132]

## CONCLUSION

Based upon the foregoing, White's Motion to Suppress[133] is DENIED.

SO ORDERED this 15th day of May, 2016.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

---

[131] *Cavely*, 318 F.3d at 995.
[132] *Buie,* 494 U.S. at 333.
[133] Dkt. 40.